IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

MICHAEL DEAN WHITE,

      Plaintiff,

v.                                    CASE NO. 2:10-cv-00684

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f.  By standing order, this case was referred to this United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B).

Plaintiff, Michael Dean White (hereinafter referred to as "Claimant"), filed applications for SSI and DIB on September 11, 2007, alleging disability as of January 1, 2005, due to mental problems/schizophrenia, attention deficit hyperactivity disorder ["ADHD"], and right heel injury.  (Tr. at 14, 130-37, 138-42, 160-69, 202, 227-31, 236-40.)  The claims were denied initially and

upon reconsideration.  (Tr. at 14, 80-84, 85-89, 94-96, 97-99.)  On May 20, 2008, Claimant requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 100-101.)  The hearing was held on September 9, 2008 before the Honorable John W. Rolph.  (Tr. at 27-75, 107.)  By decision dated December 9, 2008, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 14-26.)  The ALJ's decision became the final decision of the Commissioner on February 25, 2010, when the Appeals Council denied Claimant's request for review.  (Tr. at 1-5.)  On April 28, 2010, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. §§ 404.1520, 416.920 (2002).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. §§ 404.1520(a), 416.920(a).  The first inquiry under the sequence is

2

whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2002). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574

3

(4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date. (Tr. at 16.) Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of schizoaffective disorder and right heel injury. (Tr. at 16-18.) At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 18-19.) The ALJ then found that Claimant has a residual functional capacity for medium work, reduced by nonexertional limitations. (Tr. at 20-24.) Claimant has no past relevant work. (Tr. at 24.) Nevertheless, the ALJ concluded that Claimant could perform jobs such as dishwasher, stock clerk, janitorial, food assembler, and security work which exist in significant numbers in the national economy. (Tr. at 25-26.) On this basis, benefits were denied. (Tr. at 26.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as

> "evidence which a reasoning mind would accept
> as sufficient to support a particular
> conclusion. It consists of more than a mere
> scintilla of evidence but may be somewhat less

4

> than a preponderance. If there is evidence to
> justify a refusal to direct a verdict were the
> case before a jury, then there is 'substantial
> evidence.'"

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence.  <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

<u>Claimant's Background</u>

Claimant was twenty-six years old at the time of the administrative hearing.  (Tr. at 33.)  He has a high school education.  <u>Id</u>.  In the past, he worked at a wire manufacturing company, a grocery store, a pizza shop, an automobile parts store, and for a temporary employment agency.  (Tr. at 34-37.)  He has sufficient quarters of coverage to remain insured for DIB through December 31, 2005.  (Tr. at 14.)

<u>The Medical Record</u>

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it below.

5

Physical Evidence Prior to Date Last Insured (12/31/2005)

Records indicate Claimant began seeking treatment with Randall W. Peterson, M.D., Putnam Family Practice Associates, Inc., on July 27, 1998 for a general check-up and for concerns about Claimant's enlarged breasts.  (Tr. at 547.)  Claimant was diagnosed with gynecomastia and referred to Michael R. Spindel, M.D. (Tr. at 546-48.)  Records indicate Claimant continued to have office visits with Dr. Patterson through June 30, 2008.  (Tr. at 529-48.) Although most of the notes are handwritten and illegible, typed notes dated August 22, 2005 and June 11, 2007 indicate treatment for "psychiatric problems" which are detailed in the "Psychiatric Evidence" section on pages 16-22 of the PF&R.  (Tr. at 303-04, 532-33.)

On June 24, 2000, Michael R. Spindel, M.D. performed surgery on Claimant for male gynecomastia, stating: "This 17-year-old white male presents with C-cup sized breasts, which are symptomatic, and he is admitted for bilateral breast reduction...The final cosmetic result was satisfactory...The patient tolerated all aspects of the procedure without incident." (Tr. at 525.)

On October 17, 2000, Claimant was transferred from Putnam County Hospital to Cabell Huntington Hospital after sustaining a right heel fracture during a four-wheeling accident.  (Tr. at 475-92.)

On October 20, 2000, Luis Bolano, M.D. performed a "closed

reduction of right calcaneal fracture with application of Ilizarov external fixator." (Tr. at 477, 489.) He was discharged on October 25, 2000 with instructions to follow-up with Dr. Bolano. (Tr. at 478.)

On November 17, 2000, Claimant was admitted to Cabell Huntington Hospital due to "right calcaneous [heel] fracture with skin necrosis...subsequent soft tissue loss medially" and underwent a "right calcaneous debridement and application of wound vac" procedure. (Tr. at 493.) In the operative report, Dr. Bolano stated:

> The debridement extended down to the surface of the bone in some areas and some of the plantar medial muscles. All nonviable tissue was removed. The plan for this wound was to apply a wound vac in order to allow for sufficient granulation tissue to accept the split thickness skin graft. At this point there is no evidence of infection although the underlying tissues are somewhat devitalized. I think that the appearance of the tissue will allow satisfactory secondary healing for wound vac treatment. A sterile dressing was applied. The patient was taken to the recovery room in stable and satisfactory condition. There were no intraoperative or immediate postoperative complications.

(Tr. at 495.)

On November 22, 2000, Dr. Bolano discharged Claimant when "satisfactory wound vac management was established." (Tr. at 493.)

On February 16, 2001, Dr. Bolano performed "1. Debridement of right calcaneus. 2. Removal of external fixator...(with) no immediate postop complications." (Tr. at 498-99.)

On February 16, 2001, William E. Triest, pathologist, stated

7

in a Surgical Pathology Report: "Diagnoses: Bone from right calcaneus: bone with necrotic spicules and marrow space fibrosis; no active inflammation or bone remodeling identified." (Tr. at 500.)

On June 12, 2002, Claimant had surgery at St. Mary's Hospital by Jeffrey E. Shook, D.P.M, for "hammertoe correction two to five and partial calcanectomy of his right foot." (Tr. at 501.)

On June 12, 2002, Rodger Blake, M.D. reported that he had reviewed x-ray views of Claimant's right foot following a postoperative fusion:

> REPORT: There has been osteotomy of the distal ends of the second through fifth proximal phalanges. Wires extend through the mid and proximal phalanges into the metatarsals at the fourth and fifth toes. A wire extends through, I believe, the middle and proximal phalanges of the third toe into the third metatarsal head but this is difficult to see as the bones overlap in the lateral view. A similar finding is suggested at the level of the second toe. Two wires extend through the proximal phalanx of the right great toe in to its first metatarsal. A surgical drain is seen laterally at the level of the mid foot. There is an abnormal appearance of the calcaneus, presumably related to the fracture. The age of the injury is difficult to determine on this single lateral view.
>
> CONCLUSION: Postoperative changes are noted. Abnormal appearance of the calcaneus.

(Tr. at 511.)

On July 19, 2004, G. James Sammarco, M.D., The Center for Orthopaedic Care, Inc., wrote a letter to Art Peterson, M.D., stating that he had a consultation visit with Claimant and that he was including a report of the initial visit. (Tr. at 267.) The

8

report is not included in the medical record.

Physical Evidence After Date Last Insured (12/31/2005)

On May 14, 2007, Claimant was admitted to CAMC Teays Valley Hospital Emergency Department due to a pain in this throat, coughing, and shortness of breath. (Tr. at 293.) Dallas B. Martin, D.O. found: "Blood chemistry and comprehensive metabolic profile were all normal. Influenza A and influenza B screens were negative. Strep screen was negative...Clinical Impression: 1. Acute sinusitis. 2. Acute Bronchitis. Plan: We will start the patient on an antibiotic." (Tr. at 294.) In a chest x-ray dated May 15, 2007, Jennifer M. Smith, M.D. states: "Findings: Lungs appear clear bilaterally. Cardiac, mediastinal and hilar contours are within normal limits. Impression: No convincing active disease in the chest." (Tr. at 314.)

On January 11, 2008, a State agency medical source completed a Physical Residual Functional Capacity Assessment with a primary diagnosis of "heel problems." (Tr. at 378-86.) The evaluator, Uma Reddy, M.D., found that from January 1, 2005, the alleged onset date, to December 31, 2005, date last insured ["DLI"]: "Gait was normal, sensation WNL [within normal limits], no sensory deficits. No significant physical limitations found in the available medical evidence for the 12/05 DLI time period. Non severe physical." (Tr. at 385.)

On January 11, 2008, Dr. Reddy also completed a Physical

9

Residual Functional Capacity Assessment "current evaluation" for Claimant's primary diagnosis of "heel problems with pain." (Tr. at 387-95.) Dr. Reddy concluded: "25 years old morbidly obese male with height 6' 5" and weight 380 lbs, complains of heel problems with pain, not credible with no support from any significant physical findings. He has mental issues and is on meds. Takes no pain meds. ADLs seem okay. Non severe physical." (Tr. at 392.)

From February 13, 2008 to March 24, 2008, Claimant received twelve chiropractic treatments at Putnam Chiropractic Center. (Tr. at 414.) Although the handwritten and unsigned notes are largely illegible, Claimant's height and weight are legible: "HT. 6' 4" WT. 380." Id.

On March 20, 2008, a State agency medical source completed a Physical Residual Functional Capacity Assessment with a primary diagnosis of "foot pain." (Tr. at 396-403.) The evaluator, James Egnor, M.D. concluded: "No significant physical limitations found in the available medical evidence for the 12/05 DLI [date last insured] time period. The chart and RFC [residual functional capacity] were reviewed. The complaints are partially credible but do not impose any physical limitations and the RFC is not reduced - nonsevere physical." (Tr. at 403.)

On March 20, 2008, Dr. Egnor also completed a Physical Residual Functional Capacity Assessment "current evaluation" for Claimant's primary diagnosis of "foot pain" and secondary diagnosis

10

of "morbid obesity." (Tr. at 405-412.) Dr. Egnor found Claimant
to be able to lift and/or carry 50 pounds occasionally and 25
frequently, and to be able to stand and/or walk and able to sit
about 6 hours during an 8-hour workday with unlimited ability to
push and/or pull. (Tr. at 406.) He stated Claimant could
occasionally perform all postural activities. (Tr. at 407.) He
found Claimant had no manipulative, visual, or communicative
limitations. (Tr. at 408-09.) Claimant had no environmental
limitations save to avoid concentrated exposure to extreme cold and
vibration. (Tr. at 409.) Dr. Egnor concluded: "He has foot pain
but is fairly active. The complaints are judged to be only
partially credible and the RFC is reduced to do only medium work
with some environmental limitations. This reflects the effects of
the symptoms on ADL's and work activity." (Tr. at 412.)

On June 13, 2008, Phillip D. Surface, D.O. stated that
Claimant was admitted to Thomas Memorial Hospital emergency room
with a

> [r]ight leg injury with fracture to his
> tibia/fibula...after falling in his trailer that night.
> He said his leg went through the floor...He was taken to
> the operative suite on June 14, 2008, where he underwent
> intramedullary rodding of his right tibia with splinting.
> The patient did tolerate this procedure well...He
> actually refused gait training from physical therapy and
> states he does not need any help...He was discharged on
> June 18, 2008, to his home.

(Tr. at 551.)

On June 13, 2008, David Abramowitz, M.D. stated that a right

11

leg x-ray revealed "comminuted displaced fractures of the mid third of the tibia and fibula. No dislocation. There are surgical clips noted in the distal lower extremity and proximal foot. There is a marked deformity of the calcaneus presumably related to an old injury...No other significant findings noted." (Tr. at 560.)

In a surgical report dated June 14, 2008, Dr. Surface described Claimant's injury as a "[s]everely comminuted displaced angulated fracture of right tib/fib...(requiring) [o]pen intramedullary rodding of right tibia." (Tr. at 553-54.)

In another report dated June 14, 2008, Dr. Surface and Magdaleno Nucum, M.D. noted that upon admission Claimant "does not talk...not cooperative...He did not hit his head, no loss of consciousness...but won't respond to questions, just stares at you, no seizure, no convulsion." (Tr. at 558.)

On June 14, 2008, Dr. Abramowitz read a post-op x-ray of Claimant's right tibia-fibula: "There is interval insertion of an intramedullary rod in the tibia bridging the comminuted fracture of the mid third of the tibial shaft. There is significant improvement in alignment since the prior exam. Once again noted is a comminuted displaced fracture of the mid third of the fibula shaft." (Tr. at 561.)

On June 14, 2008, Claimant had a chest x-ray due to "[p]re-op fracture, congestion, cough, chest pain." (Tr. at 556.) Dr. Abramowitz, analyzed the view and concluded: "There is suboptimal

inspiratory effort.  Heart size is normal.  No findings of acute lung or pleural disease." Id.

On June 15, 2008, Claimant had a CT scan due to "[s]hortness of breath, rule out pulmonary embolus."  (Tr. at 555.)  Dr. Abramowitz analyzed the CT angiography of chest and concluded: "Special attention to the main pulmonary artery branches reveals no conclusive evidence of a pulmonary embolus.  There are ground glass opacities noted in the left mid and lower lung zones.  No focal areas of consolidation or pleural effusions.  No definite hila or mediastinal adenopathy.  No other significant findings noted." Id.

On June 28, 2008 and July 23, 2008, Claimant underwent a sleep study at Thomas Memorial Hospital.  (Tr. at 549-50.)  Mahendra Patel, M.D. diagnosed "obstructive sleep apnea" and recommended that it be managed with "CPAP [continuous positive airway pressure] therapy 7-8 hours every night."  (Tr. at 549.)

Psychiatric Evidence Prior to Date Last Insured

From December 4, 1991 to January 18, 1992, Claimant was a patient at HCA River Park Hospital with the chief complaint at admission stated as "poor school performance and concerns of decreased self esteem" and "temper tantrums and outbursts of yelling and screaming."  (Tr. at 449, 455.)  R. Turner, M.D. stated in an admission report: "Impression: 1.  Depressive disorder.  2.  Poor social adjustment and poor school functioning. 3.  Otherwise healthy nine year old white male.  Recommendations:

13

I really have no physical recommendations at the time.  Treatment per Dr. Priddy." (Tr. at 452, 570.)

In the January 18, 1992 discharge summary from HCA River Park Hospital, Jeffrey Priddy, M.D. stated:

DISCHARGE MEDICATIONS:
1.  Tofranil 75 mg. q.h.s.
2.  Depakote 125 mg. t.i.d., 350 mg. q.h.s.

FOLLOW-UP PLANS:
To follow-up with Dr. Priddy on 1/28/92 and with Chuck Wineberg on 1/21/92.  They are to call Huntington Mental Health Group for any concerns prior to next outpatient follow-up.

CONDITION ON DISCHARGE:
The condition on discharge was improved with depressive symtomatology and with remission of suicidal thought but with good behavior control.

PROGNOSIS:
Prognosis was good as patient was compliant with therapy during hospitalization.  Family was supportive and all were in agreement to outpatient follow-up and care.

DISCHARGE DIAGNOSES:
AXIS I:   Depressive disorder, NOS
          Attention deficit/hyperactivity disorder
AXIS II:  No diagnosis
AXIS III: N o r m a l   s l e e p   d e p r i v e d  E E G
          [electroencephalogram] with spike and wave
          activity consistent with a seizure disorder
          variant.
AXIS IV:  Mild at discharge
AXIS V:   GAF 80

(Tr. at 448, 566.)

On July 28, 1993, George M. Damous, M.A., psychologist, and Henry R. Bussey, M.A., licensed psychologist, assessed Claimant's "emotional functioning" upon referral by Putnam County Schools. (Tr. at 330-31.)  Claimant was ten years old and in the sixth grade

at the time of the assessment.  (Tr. at 330, 463.)  They stated:

> A previous psychological evaluation conducted on 3/31/93 yielded the following WISC-III scores: VIQ: 83, PIQ: 90, FSIQ:85.   An   assessment   for   Attention   Deficit Hyperactivity Disorder was also conducted on 5/13/93.  It was indicated at that time that information and data did not support a diagnosis of ADHD but did suggest possible difficulty with emotional functioning.

> Evaluation:

> The Children's Behavior Checklist indicates significant problems   with   social   withdrawal   and   aggressive tendencies.  Michael also shows significant deficiencies in social competence...

> Michael is currently taking medication [Depakote, Tr. at 332] for a Seizure Disorder...Although his father is on medication, Mrs. White stated that she believes it is not working effectively.  She explained that Michael becomes extremely angry with his father.

> Recommendations:

> The  results  of  this  evaluation  suggest  significant difficulties  with  social  skills  and  anger  control. Reports of Michael's behavior at school do not appear to be significant enough to warrant placement in a Behavior Disorder program.  Therefore, regular class placement is recommended  at  this  time.    The  information  and  data accumulated at this time appear to support the ruling out of ADHD.  Michael appears to have significant difficulty with aggression along with social skills deficits.  It is suggested that Michael obtain private counseling to help him   in   developing   social   skills,   decreasing   his aggressive tendencies, and acquiring appropriate methods of anger control.

(Tr. at 330-31, 463-64.)

On  May  18,  1993,  Bonnie  Vickers,  M.A.,  RESA  III  School Psychologist, reported that Claimant had the WISC-III, Bender-Gestalt, Attention Deficit Disorders Evaluation Scale (ADDES), and other tests administered on March 31, 1993 and May 13, 1993.  (Tr.

15

at 332-38, 465-69.) Following analysis of the tests, she recommended:

> Michael's Woodcock-Johnson Revised Reading Cluster score of 95, Math Cluster score of 92, and Written Language Cluster score of 77 is not significantly below his WISC-III Full Scale IQ of 87. However, because Michael's affect during testing indicated distractibility and anxiety, it is uncertain if these ability results are accurate indicators of his potential. The Eligibility Committee should review this and all pertinent information when education decisions are made for him. Michael's parents may also wish to check with the doctor to determine if his slow response style could be a result of his medication.

(Tr. at 338, 469.)

On March 12, 1998, Khan-Martin, M.D., psychiatrist, Huntington Behavioral Health Services, University Family Practice, provided a "Clinical Record: Assessment" of Claimant upon referral by Putnam County Schools. (Tr. at 326-28, 471-73.) Claimant was fifteen years old and in the tenth grade at the time of the examination. (Tr. at 326.) Dr. Khan-Martin stated that his assessment was based on an interview with Claimant, his mother, and review of a note from Claimant's homebound teacher, Mrs. McKay:

**Chief Complaint**

> The student ignited a pop can with gasoline in it, causing an explosion at school. He indicated this was while he was in welding class and a couple of other students were trying to cause this explosion. He indicates they didn't know how and he showed them. He reports no one was injured and everyone thought it was a joke. The teacher reported him. He was suspended and placed on homebound instruction 12/98 [sic; 1997].

> He has never repeated any grades. He has no past history of suspensions, weapons violations, or problems with law

enforcement outside of the school system.

He denies any alcohol or drug abuse. His social activities outside of the school are within acceptable limits according to his mother.

He had been diagnosed with ADHD in the first grade...He was never prescribed any medications or obtained any special services in this regard...There are no current indications of ADHD.

He has no current patterns of anxiety or depressive disturbances.

**Mental Status Examination**

An ambulatory male...neatly and casually dressed with good grooming and personal hygiene. He was oriented to time, date, person, place and situation. No significant psychomotor agitation/retardation was noted. He was cooperative, producing relevant and coherent speech of average rate and fluency. There were no indications of thought disorder, obsessions or compulsions. His ability to assimilate, synthesize and abstract information appeared grossly intact but was not tested. Judgment was intact. Insight into the problem was good. Mood was euthymic. Affect was reactive. There was no evidence of suicidal and/or homicidal ideation. There was no evidence of alcohol and/or drug abuse. Memories were not tested and no impairment was obvious on interview. Remote memory was intact. Intellectual functioning was estimated in the average range.

Medical

The patient takes no current medications. He has no medical conditions...

Recommendations

On the basis of the available information, there appears to [be] no indication that this student is more likely than his peers in general to cause serious harm to himself or others. On this basis there appears to be no psychiatric reason to maintain him outside of an academic environment otherwise appropriate to his education needs. No additional services are recommended.

(Tr. at 326-28.)

On March 12, 1998, Kenneth J. Devlin, M.A., licensed psychologist, wrote a letter to Putnam County Schools stating that he had assessed Claimant with Dr. Khan-Martin and concurred with his opinion.  (Tr. at 329, 474.)

In an undated report from the same time period, Henry R. Bussey, M.A., licensed psychologist, stated:

> Mike's performance on the WISC-III suggests intellectual ability in the average range... Mike reproduced the Bender-Gestalt designs with no errors...While Mike obviously displayed poor judgment regarding the incident that led to his suspension from school, he is not considered to pose an imminent threat to the safety of himself or others.

(Tr. at 459-61.)

Records indicate Claimant was treated by Randall W. Peterson, M.D., a family practitioner, on six occasions from March 10, 2004 to June 29, 2007 for pain, depression, mood swings and behavior problems.  (Tr. at 302-09.)  Although most of the records are handwritten and illegible, the reports dated August 22, 2005 and June 11, 2007 (see details below in chronological order) are typed and relate to psychiatric issues.  (Tr. at 303-04.)

Records from Mildred Mitchell-Bateman Hospital indicate Claimant was admitted on April 23, 2005 and discharged on May 21, 2005 for a trial visit to his parents' home.  (Tr. at 268-85.) A discharge summary signed by Arturo Lumapas, M.D., Staff Psychiatrist, states:

**Reason for Admission**:  The patient exhibited aggressive outbursts toward his parents.  He threatened to shoot himself with a gun.

**Admission Diagnoses**:
Axis I.   Intermittent Explosive Disorder.
          R/O [Rule Out] Bipolar Disorder Type 2.
          Alcohol Abuse.
          Marijuana dependence, in sustained remission.
     II.  R/O Borderline Intellectual Functioning.
     III. H/O [history of] Right Heel Injury.
          Obesity.
     IV.  Poor Insight.
          Impulse Control Problems.
     V.   Admission GAF [Global Assessment of Functioning]: 40...

**Discharge Diagnoses**:
Axis I.   Psychosis, NOS [not otherwise specified].
          Intermittent Explosive Disorder.
          Marijuana Dependence.
          Alcohol Abuse.
     II.  No Diagnosis.
     III. Obesity[1]
          H/O Right Heel Injury.
     IV.  Psychosocial Stressors: Mild to Moderate.
     V.   Current GAF: 45-50...

**History of Present Illness**:  This is the second psychiatric hospitalization for this patient.  This is his first admission to this facility.  He is a 22-year-old, single, white male who is unemployed and lives with his parents.  The patient has a history of behavior problems in the past.  He has not been under psychiatric care for the past five years...The patient did admit to getting the ax after his mother...He stated that he tried to choke his father because he was "just joking."  He reported that he stabbed his father with a plastic fork in the leg while he was in the kitchen.  He reported that this was also "for fun." The patient stated that he took his gun to go outside for target practice and was not planning to kill himself...

The patient reported having mood swings throughout his

---

[1] Claimant testified on September 9, 2008 that he was 6' 4" tall and weighed 280 pounds.  (Tr. at 33.)

life.  His depression has lasted two to three days at a time in which he feels "lazy."  He sleeps more but his appetite is not disturbed.  He denied feeling guilty and denied feeling suicidal...

**Psychiatric History**: The patient was hospitalized at River Park Hospital at the age of ten due to behavior problems.  He had been fighting with his parents and other children...

**Aftercare Plan:** Discharge medication included Risperdal 1 mg b.i.d., Trileptal 300 mg b.i.d., Topamax 100 mg b.i.d., Ultracet two tablets q. 6h. p.r.n. and Motrin 800 mg t.i.d. p.r.n.  His first appointment for follow up at Prestera-Putnam County, Winfield, was scheduled for May 24, 2005 at 1 p.m. with the intake worker.  His diet remained regular.  His activities were not limited.

(Tr. at 268-72.)

On August 22, 2005, Dr. Peterson reported that Claimant was accompanied by his parents to discuss his behavioral problems. (Tr. at 304.)   Dr. Peterson stated:

[T]he patient denied any type of problems.  His history was obtained from the patient's mother.  The patient has been having episodes of severe anger where he will hit the wall, yell and scream and threaten the health of the mother and father.  She relates that he has held a gun to her in the past.  A mental hygiene warrant was obtained, and the patient was admitted to the Mildred Bateman Center for 30 days and discharged on 5/5/05.  He was placed on some medication at that time, but he has not taken any since discharge and refused to think that he may need any medication.  He thinks that he has no problems, and the problems lie totally with his mother and father...The patient does complain of some intermittent occipital headaches...He has a history of head trauma in a motor vehicular accident several years ago.  Patient will sleep for hours at a time (up to 20)...His appetite is good, and he is gaining weight.  He denies any suicidal or homicidal thoughts, but does relate that he gets "ticked off" very easily when people do things to provoke him.  He does not think that any of his activities cause him any problems.

20

> Physical Exam: Skull - NT [Neurologically Typical].
> Pupils - reactive.  Neuro Exam: Intact.  Patient is
> awake, alert, oriented x 3.
>
> A [Analysis]: 1.   Anti-social behavior vs [versus]
> possible  adjustment  reaction.   2.   Questionable
> underlying bipolar.  Patient has been treated in the past
> for depression and has been given prescriptions on at
> least two occasions which he refused to fill or take.  3.
> Headaches - most likely tension in origin...Offered CT or
> MR evaluation of the head to fully evaluate the changes
> but patient declines at this time.  Offered psychological
> counseling for both patient and family, but patient
> declines to think that he has a problem and wishes no
> intervention.  He will notify this office if any further
> treatment is wanted.
>
> ADDENDUM: After patient and mother left the office, the
> mother came in within moments and said that the patient
> pounded the hood on the car causing a large dent.  She
> feels that she might be at risk having the patient
> around, and she was told to have him evicted from her
> home to provide her safe haven.

Id.

On January 8, 2008, a State agency medical source completed a Psychiatric Review Technique form for the time period from January 1, 2005 to December 31, 2005.  (Tr. at 350-63.)  The evaluator, John Todd, Ph.D., licensed psychologist, concluded: "Case cannot be adjudicated due to insufficient evidence for given time period." (Tr. at 362.)

On March 26, 2008, a State agency medical source completed a Psychiatric Review Technique form for the time period from January 1, 2005 to December 31, 2005.  (Tr. at 415-29.)  The evaluator, Jeff Harlow, Ph.D., licensed psychologist, concluded: "Although there is evidence of treatment, there isn't any ADL data during the

adjudication period.  Thus, the claim is assessed as 'Insufficient Evidence.'"  (Tr. at 427.)

Psychiatric Evidence After Date Last Insured

On April 25, 2007, Elizabeth Durham, M.A., licensed psychologist, prepared an Adult Mental Profile report for the West Virginia Disability Determination Service following her clinical interview, testing, and mental status examination of Claimant on April 4, 2007. (Tr. at 286-91.)  She observed Claimant's posture, gait, eye contact, speech, judgment, immediate memory, recent memory, remote memory, concentration, psychomotor behavior, social functioning, persistence, and pace to be within normal limits. (Tr. at 286-89.)  She found his appearance to be adequate and his attitude/behavior to be "good" and "cooperative." (Tr. at 288.) He was fully oriented with a "dysphoric" mood and "restricted" affect.  Id.  He had no evidence of delusions, preoccupations, obsessions or phobias, depersonalizations, deja vu or hallucinations and no suicidal ideation.  Id.  Regarding Claimant's thought process, she concluded: "There were no loose associations, incoherence, poverty of speech content, perseveration, thought blocking, echolalia or clanging.  There was no circumstantiality, flight of ideas, tangentiality, word salad or neologisms."  Id.

Ms. Durham stated that Claimant's insight was fair, that he interacted appropriately with her during the evaluation, and that he is capable of managing finances.  (Tr. at 288-89.)  Claimant

22

described his daily activities as "[w]atching TV and doing little side jobs to try to make some money." (Tr. at 289.) She noted that he stated that he is not receiving mental health treatment but did go to Prestera Center two weeks ago and has a return appointment in three weeks. (Tr. at 287.)

Ms. Durham found that Claimant put forth a good effort in his intellectual assessment testing and that the results were valid. (Tr. at 289.) His WAIS-III scores were: Verbal IQ 86; Performance IQ 94; Full Scale IQ 89; Verbal Comprehension Index 89; Perceptual Organization Index 94; Verbal Mean 7.6; and Performance Mean 9.2. (Tr. at 288-89.) His WRAT-3 scores were: Reading, 94 standard score, a high school grade score; Spelling, 75 standard score, a 5th grade score; and arithmetic, 84 standard score, a 6th grade score. (Tr. at 289.) She noted that she reviewed Claimant's WISC-III from Putnam County Schools obtained on April 18, 1996, which showed: "Verbal IQ of 81, Performance IQ of 96, and Full Scale IQ of 87." (Tr. at 287.)

Ms. Durham diagnosed Claimant with "Schizoaffective Disorder...based upon Mr. White's reported history of a period of illness in which there has been major depressive episodes and hypomanic phases. He reported he has experienced auditory and visual hallucinations. He reported he has also experience these hallucinations in absence of prominent mood symptoms." (Tr. at 289.)

23

On June 11, 2007, Dr. Peterson reported that Claimant presented with his mother to talk about his psychiatric problems. (Tr. at 303.) Dr. Peterson stated:

> 24 YO [year old] male presents w/ [with] his mother today to talk about his psychiatric problems. Patient has not been seen in this office since August 2005 and related that he hasn't seen a psychiatrist since that time either...They concur that the patient hears voices and at times hears messages from God telling him to do things. Patient feels like this is a normal thing but would like for this to stop. He has no visual hallucinations. Mother relates he continues to get into verbal and physical confrontations. He struck his father last month blacking an eye and recently the mother has left the home after being assaulted by the patient. She relates that there are periods of extreme anger and emotional lability. She relates that he does socially inappropriate things when he is out w/ her such as exposing himself...
>
> Mental status exam - patient is awake, alert, oriented x 3. Thought processes are confused, he is illogical, be becomes confrontational, he talks a lot about masturbation, he denies hearing any voices at this time. He denies suicidal thoughts. He does relate that he gets "ticked off" easily.
>
> A [analysis]: 1. Abnormal personality w/ possible schizophrenic tendencies. Patient has anti-social behavior and adjustment reaction difficulties. He and his mother relate that he may have been diagnosed as having bipolar disorder in the past but they doubt that diagnosis. He needs further psychiatric evaluation and treatment. 2. Cephalalgia - most likely tension in origin but w/ patient's psychiatric situation need to rule out subdural hematoma...
>
> P [plan]: 1. Labs have been done recently... 2. MRI of the head. 3. Refer to Prestera Center for full psychiatric evaluation. Patient is willing to go at this time but does not feel that medications will help and does not really want to take any.

Id.

24

On July 8, 2007, Claimant underwent an MRI Brain with and without contrast at Thomas Memorial Hospital per the referral of Dr. Peterson. (Tr. at 310.)  James Baek, M.D. reported: "The ventricles are of normal size and configuration.  No focal parenchymal abnormalities are seen.  There is no evidence of hemorrhage.  There is no midline shift or mass effect.  Following intravenous contrast, there is a normal pattern.  Impression: Negative examination."  Id.

Records indicate Claimant received services at Process Stategies on September 29, 2007, October 3, 2007 and October 24, 2007. (Tr. at 323-25, 526-28.)  Although the handwritten notes are largely illegible, notes dated October 24, 2007 appear to state in part:    "[D]enies   suicidal   thoughts,   denies   homicidal thoughts...denies hallucinations, denies hollering and screaming... denies self abuse; denies self mutilation."  (Tr. at 323, 526.) Further notations state: "[h]ospital meds 'made me a space dummy – drooling'." (Tr. at 325, 528.)

On October 19, 2007, River Park Hospital returned a form to the Social Security Administration stating: "We have no record of a patient with this birth date and/or social security number." (Tr. at 317.)

On October 24, 2007, St. Mary's Medical Center returned a form to the Social Security Administration stating: "The patient was not seen on the date(s) indicated on your request."  (Tr. at 319.)

On October 24, 2007, the Social Security Administration also had an unsuccessful attempt to obtain medical evidence of record from Cabell Huntington Hospital. (Tr. at 320-22.)

On January 8, 2008, Dr. Todd also completed a Psychiatric Review Technique form for the period from September 11, 2007 to January 8, 2008. (Tr. at 364-77.) He found Claimant's impairment was not severe regarding his affective and substance addiction disorders. (Tr. at 364.) He concluded that Claimant's "Schizoaffective D/O [disorder]" and "ETOH [ethyl alcohol] and THC [Tetrahydrocannabinol (psychoactive compound in marijuana)] Abuse" caused a mild degree of limitation in Claimant's restriction of activities of daily living and difficulties in maintaining social functioning, concentration, persistence or pace. (Tr. at 367, 372, 374.) He found no episodes of decompensation of extended duration and no evidence to establish the presence of the "C" criteria. (Tr. at 374-75.) Dr. Todd noted:

> CLMT [claimant] is mostly credible w/ [with] past psych IP [in-patient] and present OP [out-patient] TX/meds [treatment/medications]. Despite alleging problems in mental functioning, clmt's MS [mental status] at CE [clinical evaluation] was all WNL [within normal limits]. ADL's are performed independently including uses public transportation, drives, shops, counts money, interacts w/ family, small jobs in area to make spending money (told to CE examiner). The mental condition does not pose functional limitations and limitations due to a mental D/O [disorder] are considered NON-SEVERE.

(Tr. at 376.)

On March 26, 2008, Dr. Harlow also completed a Psychiatric

Review Technique form for the period from January 1, 2005 [sic; 2006] to March 26, 2008. (Tr. at 430-44.) He found Claimant's impairment was not severe regarding his schizoaffective disorder. (Tr. at 430, 433.) He found a mild degree of limitation in Claimant's restriction of activities of daily living and difficulties in maintaining social functioning, concentration, persistence or pace. (Tr. at 440.) He found no episodes of decompensation of extended duration and no evidence to establish the presence of the "C" criteria. (Tr. at 440-41.) Dr. Harlow noted:

> A Schizoaffective Disorder is denoted by treating source findings. It is concluded that this mental impairment is not severe because all KEY-Functional Capacities are indicated to be mildly deficient. Since comments about functional capacities are externally inconsistent with clinical results of the treating source, they are regarded as partially credible.

(Tr. at 442.)

On September 15, 2008, R. W. Peterson, M.D. completed a form titled "Medical Assessment of Ability to do Work-related Activities (Physical)." (Tr. at 577-80.) He checked spaces indicating that Claimant's lifting/carrying and standing/walking were affected by impairment. (Tr. at 577.) He stated that Claimant could do standing/walking for a total of two hours in an 8-hour workday and for twenty minutes without interruption due to "severe pain with standing." Id. Dr. Peterson indicated that Claimant's sitting was not affected by impairment but that "at present" he should perform

27

none of the postural activities due to "still has brace on foot and uses crutches." (Tr. at 578.)   His only environmental restriction was "heights" due to "crutches, poor foot mobility." Id.  He noted Claimant's prior right foot and leg injuries.  (Tr. at 579.)  He concluded that Claimant had no manipulation or communication limitations.  (Tr. at 579-80.)   Dr. Peterson has hand-written conclusory remarks that are illegible except for the words "He is prone to...explosive anger." (Tr. at 580.)

On September 9, 2008, Claimant testified extensively in an administrative hearing.  (Tr. at 33-60.)  He testified that he graduated from high school and did not have any problem with reading or writing.  (Tr. at 34.) He stated that he had a driver's license and passed it on his first examination. Id.  He testified regarding several "small, odd jobs" at which he had been employed and his welding training. Id.  He described incidents of feeling "harassed" and having "problems...with authority" which could be described as anti-social behavior.  (Tr. at 34-38.) He further testified that Dr. Peterson had treated him "for mental, for anger problems." (Tr. at 38.) When Claimant's representative asked "Do you think he's helped you mentally?"  (Tr. at 42.)  Claimant responded "So far, yeah.  The Seroquel is doing good.  I'm doing good on the Seroquel, yeah." Id.  He also responded affirmatively to the ALJ that he was taking his medications as prescribed and that they were helping him.  (Tr. at 53-54.)  The representative

further inquired "You believe that your anger is under control at this point?" Id. Claimant replied "Yeah." Id. The representative then asked "What do you do all day?" Claimant responded "Right now I'm just sitting around and I'm healing, just letting my leg heal. Taking my medicine and everything." Id. Claimant told the ALJ that he was getting off his crutches in two weeks. (Tr. at 54.) During questioning from his representative, Claimant testified that he did not have a problem trusting his doctors or therapists although he did at times feel they were "trying to mess with me." (Tr. at 56.) When his representative asked if he was "oppositional or refused to do things" recommended by his doctors, Claimant responded "No. I mean, I take the medicine as it's prescribed." (Tr. at 56.) He further testified that he did not "recall" or "remember" threatening his mother with an ax, banging on her car hood, choking his mother, or blacking his father's eye. (Tr. at 47, 52, 57.) He also testified that he heard voices "trying to make it sound like it was God" but responded "no" when asked if it happened a lot to him. (Tr. at 58-59.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because (1) although the ALJ found Claimant's schizoaffective disorder to be a severe impairment, the mental residual functional capacity ["RFC"]

29

assessment did not consider the impact of Claimant's intermittent explosive disorder impairment on functional ability as required by SSR 96-8p; and (2) the ALJ failed to develop the record by not ordering a consultative examination.  (Pl.'s Br. at 2-7.)

The Commissioner asserts that (1) substantial evidence supports the ALJ's assessment of Claimant's mental RFC; and (2) the ALJ was not required to order a consultative physical examination. (Def.'s Br. at 9-16.)

Assessment of Mental RFC

Claimant first argues that while the ALJ found Claimant's schizoaffective disorder to be a severe impairment, the RFC assessment does not consider the impact of Claimant's intermittent explosive disorder impairment on functional ability as required by SSR 96-8p.  (Pl.'s Br. at 2-5.)   Specifically, Claimant asserts:

> The ALJ limited the claimant to medium work with a sit or stand alternatively at will provided he is not off task more than 10% of the work period.  He is limited to work where there is only occasional interaction with co-workers and the public (Transcript pg. 20).
>
> The ALJ found that the claimant suffers from two (2) severe impairments; schizoaffective disorder and right heel injury (Transcript pg. 16).  However, he did not consider any of the claimant's "non-severe" impairments when determining his RFC.
>
> The claimant also suffers from intermittent explosive disorder (Transcript pg. 268)...[It] is a separate diagnosis from his schizoaffective disorder, and therefore should be considered when deciding the claimant's RFC...
>
> At hearing, Mr. White's representative asked the vocational expert whether anger problems, causing

30

emotional and violent outbursts about twenty percent of
the time in a work setting, would preclude sustained
employment.   The vocational expert opined that an
individual with such a limitation would not be able to
sustain employment (Transcript pg. 65)...

The ALJ found "the objective findings do not support such
a limitation" (Transcript pg. 26).   However, it seems
this is just a blanket statement that the ALJ made to
discredit the representative's line of questioning.
There is no objective evidence that could support the
claimant's Intermittent Explosive Disorder.  Intermittent
Explosive Disorder is not an impairment that can be
objectively tested.   Mr. White has been involuntarily
committed to the hospital numerous times for
uncontrollable anger.  That evidence is about as good of
objective evidence as one can get for Intermittent
Explosive Disorder.

(Pl.'s Br. at 3-4.)

The Commissioner responds that the ALJ's assessment of
Claimant's mental impairment, which the ALJ accommodated by
limiting Claimant only to work that does not involve more than
occasional interaction with co-workers and the public, is amply
supported by substantial evidence in the record.   More
specifically, the Commissioner argues:

Plaintiff does not directly challenge the substantial
evidentiary basis for the ALJ's conclusions.   Instead,
Plaintiff focuses on a technical issue, namely, that the
record contained a diagnosis of "intermittent explosive
disorder," but when the ALJ identified Plaintiff's severe
mental impairments, the ALJ only identified Plaintiff's
schizoaffective disorder and not his intermittent
explosive disorder diagnosis (Tr. 16).  This argument is
entirely without merit.

First, Plaintiff was diagnosed with intermittent
explosive disorder early on, by doctors who did not
specifically diagnose schizoaffective disorder.   The
intermittent explosive disorder diagnosis appears on the
discharge summary from Mildred Mitchell Bateman Hospital,

31

together with a diagnosis of psychosis not otherwise specified (NOS), marijuana dependence, and alcohol abuse (Tr. 268). Later notes from Dr. Peterson identify "possible schizophrenic tendencies" (Tr. 303). And when Ms. Dunham reviewed the hospitalization records and conducted a further examination and evaluation of Plaintiff, she identified Plaintiff's mental disorder specifically as schizoaffective disorder (Tr. 289). According to the <u>Diagnostic and Statistical Manual (DSM)</u>, intermittent explosive disorder is only a free-standing diagnosis if the aggressive episodes are not better accounted for as an associated feature of another mental disorder, such as schizophrenia. <u>DSM-IV-TR</u> at 666-67 (4th ed. 2000)...The ALJ appropriately relied on Ms. Dunham's description of Plaintiff's diagnosis in describing Plaintiff's mental impairment at step 2 of the sequential analysis as "schizoaffective disorder." The state agency reviewing psychologist also assigned that diagnosis, without separately diagnosing "intermittent explosive disorder" (Tr. 433).

Moreover, in this case, the ALJ unequivocally understood that the anger outbursts that were described in various records were a feature of Plaintiff's mental impairment, whatever its label...The ALJ did not somehow overlook Plaintiff's anger outbursts in identifying Plaintiff's severe mental impairment, despite Plaintiff's suggestion to the contrary.

But even if Plaintiff could demonstrate an error in the ALJ's identification of his mental impairment, it would be completely harmless in this case. Whenever an ALJ makes a finding of some severe impairment at step 2, this requires the ALJ to continue the sequential evaluation process and make the critical RFC assessment - an assessment based on *all* of Plaintiff's impairments, whether or not severe...

Here, just as he did at step 2 in identifying Plaintiff's severe impairments, when assessing Plaintiff's RFC, the ALJ once again immediately addressed Plaintiff's anger issues. The ALJ explained: "As for the claimant's schizoaffective disorder, he had a long history of situational anger outbursts, two of which resulted in psychiatric facility admissions" (Tr. 23). Again, the label attached to Plaintiff's outburst issues is not important; a claimant's RFC is determined based on a claimant's *capabilities*, "not his exact diagnosis."

(Def.'s Br. at 11-14.)

At steps four and five of the sequential analysis, the ALJ must determine the claimant's residual functional capacity (RFC) for substantial gainful activity.  "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job.  20 C.F.R. §§ 404.1545(a) and 416.945(a) (2010).  "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)."  Id.  "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

The RFC determination is an issue reserved to the Commissioner.  See 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2) (2010).

> In determining what a claimant can do despite
> his limitations, the SSA must consider the
> entire record, including all relevant medical
> and nonmedical evidence, such as a claimant's
> own statement of what he or she is able or
> unable to do.  That is, the SSA need not

33

> accept only physicians' opinions.  In fact, if
> conflicting medical evidence is present, the
> SSA has the responsibility of resolving the
> conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The ALJ wrote a substantial decision wherein he fully considered the medical evidence of record, including Claimant's testimony, and concluded Claimant had the severe impairment of schizoaffective disorder (and right heel injury) with the RFC to perform medium work, reduced by nonexertional limitations, including that he would be limited to work where there is only occasional interaction with co-workers and the public. (Tr. at 14-26.)  Contrary to Claimant's assertion, the ALJ did consider the impact of Claimant's intermittent explosive disorder impairment on functional ability and his RFC assessment and decision fully complied with the requirements of Social Security Ruling 96-8p that

> [i]n assessing RFC, the adjudicator must consider
> limitations and restrictions imposed by all of an
> individual's impairments, even those that are not
> "severe." While a "not severe" impairment(s) standing
> alone may not significantly limit an individual's ability
> to do basic work activities, it may--when considered with
> limitations or restrictions due to other impairments--be
> critical to the outcome of a claim.  For example, in
> combination with limitations imposed by an individual's
> other impairments, the limitations due to such a "not
> severe" impairment may prevent an individual from
> performing past relevant work or may narrow the range of
> other work that the individual may still be able to do.

SSR 96-8p, 1996 WL 362207, *34477 (1996).

In determining that Claimant had the severe impairment of

schizoaffective disorder, the ALJ made these findings regarding Claimant's mental health, including "temper flares...yelling, screaming, stomping, and slamming doors...problems with his temper...exhibiting aggressive outbursts":

The claimant was involuntarily admitted to HCA River Park Hospital on December 4, 1991, with a chief complaint according to his mother of poor school performance and concerns of decreased self esteem. The claimant's mother noted a longstanding history of temper flares that seemed to worsen with decreased school performance that consisted of yelling, screaming, stomping, and slamming doors. The claimant was discharged on January 18, 1992, with a diagnosis of attention deficit hyperactivity disorder (Exhibit 20F). On March 12, 1998, the claimant underwent a psychological evaluation by Huntington Behavior Health Services to help determine the presence of attention deficit hyperactivity disorder. The attention deficit hyperactivity disorder evaluation scales assist in providing a measure of the characteristics. Scores of seven through thirteen are considered average while scores below seven suggest the presence of attention deficit hyperactivity disorder. The claimant's school version scores indicated a slight problem with impulsivity in one class. His home version attention deficit hyperactivity disorder evaluation scale indicated problems with inattentiveness and impulsivity (Exhibit 10F). There is no evidence of ongoing treatment or medication for attention deficit hyperactivity disorder. Accordingly, I find the claimant has no severe attention deficit hyperactivity disorder.

On April 23, 2005, the claimant was involuntarily admitted to Mildred Mitchell-Bateman Hospital by his mother for problems with his temper...exhibiting aggressive outbursts toward his parents and threatening to shoot himself with a gun (Exhibit 2F). On April 4, 2007, the claimant underwent a psychological consultative examination by Elizabeth Durham, M.A., licensed psychologist and was diagnosed with schizoaffective disorder (Exhibit 3F). On June 11, 2007, Randall Peterson, M.D., diagnosed the claimant with abnormal personality with possible schizophrenic tendencies (Exhibit 5F).

Based on this evidence, I find the claimant's schizoaffective disorder is a severe impairment.

(Tr. at 17-18.)

In evaluating Claimant's RFC, the ALJ made these additional findings regarding Claimant's schizoaffective disorder and "long history of situational anger outbursts...problems with his temper and exhibiting aggressive behavior toward his parents...hearing voices from God" and their affect upon his RFC:

> As for the claimant's schizoaffective disorder, he had a long history of situational anger outbursts, two of which resulted in psychiatric facility admissions (Exhibits 2F and 20F). During a hospitalization at River Park Hospital, the claimant underwent family therapy and treatment and his parents felt that he had done much better with hospitalization than he did prior to the admission. His teachers felt that he had considerable improvement in behavior, outlook, and motivation. It was felt that the claimant had reached maximum benefit from his hospital stay. Upon discharge, the claimant's prognosis was good as he was compliant with therapy during hospitalization. During a psychiatric evaluation on December 4, 1991, the claimant's content of thought was negative for hallucinations, illusions, or delusions, and negative for the presence of suicidal, or homicidal thought or intent (Exhibit 20F). The claimant was involuntarily admitted to Mildred Mitchell-Bateman Hospital on April 23, 2005, due to problems with his temper and exhibiting aggressive behavior toward his parents. He also threatened himself prior to admission. During a mental status examination the claimant's immediate, recent and remote memory appeared to be intact. He was alert and able to maintain attention during the interview. He demonstrated fair concentration. He denied any delusions or hallucinations (Exhibit 2F). However, the claimant testified that he got delusional and talked to Dr. Peterson about hearing voices from God. The claimant's mother testified that he talked about hearing voices and at night he had conversations with these voices. In a psychological consultative examination dated April 4, 2007, the claimant was diagnosed with schizoaffective disorder. He

36

reported that he was not receiving mental health treatment. In a mental status examination it was indicated there was no evidence of illusions, depersonalizations, deja vu or hallucinations. His immediate, recent, and remote memory was within normal limits (Exhibit 3F). In a progress note dated August 22, 2005, by Randall Peterson, M.D., it was indicated that the claimant was placed on medication at the time of discharge from Mildred-Bateman Hospital but he refused to think that he may need any medication. He thought that he had no problems, and the problems lie totally with his mother and father. He had been given prescriptions on at least two occasions which he refused to fill or take. However, the claimant testified at hearing that he took the medications that were prescribed to him. Dr. Peterson offered psychological counseling for both claimant and family, but he declined to think that he had a problem and wished no intervention. On June 11, 2007, the claimant indicated he was willing to go for a psychiatric evaluation but did not feel that medications would help and he did not really want to take any (Exhibit 5F). In a report dated March 12, 1998, from Huntington Behavioral Health Services it was noted that there appeared to be no indication that the claimant was more likely than his peers in general to cause serious harm to himself and others. A psychological evaluation dated July 20, 1993, reported that the claimant's behavior at school did not appear to be significant enough to warrant placement in a Behavior Disorder program. There was no diagnosis or psychological problems noted (Exhibit 10F). The claimant's mental status examination and consultative examination all reflect that the claimant was functioning within normal limits (Exhibit 12F). The claimant was able to live by himself in a trailer until he was arrested (currently facing four felony counts for breaking and entering). The claimant testified at the hearing that he only had problems in two of the last nine jobs that he had held. These problems were "sex discrimination" and one "rude behavior" issue. He also testified that Dr. Peterson had prescribed Seroquel and that his anger issues were "under control."

As for the opinion evidence, on April 4, 2007, Elizabeth Durham, M.A., licensed psychologist, performed a psychological consultative examination and diagnosed the claimant with schizoaffective disorder (Exhibit 3F). I give Ms. Durham's opinion great weight as to the

37

> diagnosis and her findings of within normal limits on all
> functioning...
>
> John Todd, Ph.D., a State agency medical expert, reviewed
> the evidence of record on January 8, 2008, from January
> 1, 2008 [sic; 2005] to December 31, 2005, the claimant's
> date last insured.  Dr. Todd completed a Psychiatric
> Review Technique form.  Dr. Todd evaluated the claimant
> under sections 12.04 and 12.09 of the Listings and opined
> that the claimant had no severe mental impairment.  With
> regard to the "B" criteria, Dr. Todd opined that the
> claimant had mild restriction of daily activities of
> daily living; mild difficulties in maintaining social
> functioning; mild difficulties in maintaining
> concentration, persistence, or pace; and no episodes of
> decompensation.  Dr. Todd's observations regarding the
> claimant's activities of daily living [were that they]
> did not support his alleged limitations (Exhibit 12F).
> The undersigned concurs with Dr. Todd's opinions.

(Tr. at 23-24.)

Clearly, the ALJ has fully considered Claimant's anger problems and has included them in his determination of Claimant's severe impairment of schizoaffective disorder.  Moreover, Claimant's representative admits: "There is no objective evidence that could support the claimant's Intermittent Explosive Disorder.  Intermittent Explosive Disorder is not an impairment that can be objectively tested."  (Pl.'s Br. at 5.)   As pointed out by the Commissioner: "According to the Diagnostic and Statistical Manual (DSM), intermittent explosive disorder is only a free-standing diagnosis if the aggressive episodes are not better accounted for as an associated feature of another mental disorder, such as schizophrenia.  DSM-IV-TR at 666-67 (4th ed. 2000)."  (Def.'s Br. at 12.)

38

With respect to Claimant's argument that the ALJ's RFC assessment does not consider the impact of Claimant's intermittent explosive disorder impairment on functional ability as required by SSR 96-8p, the undersigned proposes that the presiding District Judge find that the ALJ properly assessed Claimant's mental impairment. The ALJ properly considered the applicable regulations and his findings are supported by substantial evidence.

<u>Duty to Order Consultative Examination</u>

Claimant next argues that the ALJ erred by failing to develop the record by ordering a consultative examination. (Pl.'s Br. at 5-7.) Specifically, Claimant asserts:

> Mr. White was never sent for a physical examination by Social Security. The claimant suffered an extensive injury to his right foot and ankle in 2000. The claimant's treating physician, Dr. Peterson, noted that the claimant had some decreased strength in his right foot and ankle (Transcript pgs. 302-15). The claimant suffered another injury to his right leg on June 14, 2008 when he fell through a floor board. The claimant was still on crutches when he attended his hearing. The ALJ had a duty to determine the extent of the claimant's injuries and their effect on his RFC. The ALJ erred in failing to develop the record by failing to order a consultative examination in this case.

(Pl.'s Br. at 6-7.)

The Commissioner responds that the ALJ was not required to order a consultative physical examination. (Def.'s Br. at 15-16.) Specifically, the Commissioner asserts:

> Here, the evidence concerning Plaintiff's ankle impairment was comprehensive...The record contained notes from Dr. Peterson for many years and hospital records back to the time of Plaintiff's ATV accident (Tr. 303,

304, 306, 307, 475, 477, 508, 529, 543).   The record
showed that Plaintiff had not taken pain medication in
recent years (Tr. 392).   Plaintiff testified that he
could stand for 4 or 5 hours at a time (Tr. 44).   State
agency physicians were able to assess Plaintiff's
physical RFC from the evidence contained in the record
(Tr. 385, 392, 396, 405).   There is no basis for
Plaintiff to challenge the ALJ's exercise of discretion
not to order a consultative examination.

(Def.'s Br. at 16.)

Regarding Claimant's leg injury, the Commissioner argued:

Plaintiff references his healing broken leg, but the
evidence before the ALJ was clear that Plaintiff was
expected to heal promptly and would be out of his cast
within a couple of weeks (Tr. 54).   This type of short-
term injury is not a disabling impairment:   a person is
"disabled" for purposes of DIB and SSI only if the person
suffers from the "inability to engage in any substantial
gainful activity by reason of any medically determinable
physical or mental impairment which can be expected to
result in death or which has lasted or can be expected to
last for a continuous period of not less than 12
months..."   42 U.S.C. § 423(d)(1)(A); 42 U.S.C. §
1382c(a)(3)(A).

(Tr. at 16.)

The ALJ wrote an extensive thirteen-page decision wherein he

detailed Claimant's medical evidence, including Claimant's right

leg and foot injuries:

On June 14, 2008, the claimant was admitted to Thomas
Memorial Hospital after a fall in which his right leg
went through a floor board.   He received a severely
comminuted displaced angulated fracture of his right
tibia/fibula.   The claimant underwent an open
intramedullary rodding of the right tibia.   He refused
gait training from physical therapy and stated he did not
need any help.   The claimant was discharged on June 18,
2008, after being given antibiotics as well as Lortab
(Exhibit 27F).   There is no evidence of further
complaints or treatment for the claimant's fracture of
his right tibia/fibula.   The claimant testified at the

40

hearing that he would be off his crutches in a couple of weeks. Accordingly, I find the claimant's fracture of his right tibia/fibula to be a non-severe impairment...

With regard to the claimant's foot pain, he was hospitalized at Cabell Huntington Hospital on October 17, 2000, following a four-wheeler accident and sustained a right comminuted calcaneal fracture. On October 20, 2000, the claimant underwent a closed reduction of right calcaneal fracture with application of Ilizarov external fixator. On November 17, 2000, the claimant was admitted to Cabell Huntington Hospital for a right debridement of medial skin (skin subcutaneous tissue, muscle and bone) and application of wound vac. On February 16, 2001, the claimant underwent an operation to remove the external fixation device on the right lower extremity. On December 11, 2000, the claimant underwent debridement of the right calcaneous. On December 13, 2000, he had a placement of PICC line. On December 15, 2000, the claimant had an incision and drainage of the right calcaneous with placement of antibiotic beads. On June 12, 2002, the claimant underwent surgery for malunion with exostosis secondary to calcaneat fracture of the right heel (Exhibit 24F).

Based on this evidence, I find the claimant's right heel injury is a severe impairment.

(Tr. at 17-18.)

Regarding the ALJ's duty to refer a claimant for a consultative examination, 20 C.F.R. § 416.917 (2010) provides that

> [i]f your medical sources cannot or will not give us sufficient medical evidence about your impairment for us to determine whether you are disabled or blind, we may ask you to have one or more physical or mental examinations or tests.

In <u>Cook v. Heckler</u>, the Fourth Circuit noted that an ALJ has a "responsibility to help develop the evidence." <u>Cook v. Heckler</u>, 783 F.2d 1168, 1173 (4th Cir. 1986). The court stated that "[t]his circuit has held that the ALJ has a duty to explore all relevant

41

facts and inquire into the issues necessary for adequate development of the record, and cannot rely on evidence submitted by the claimant when that evidence is inadequate." Id. The court explained that the ALJ's failure to ask further questions and to demand the production of further evidence about the claimant's arthritis claim, in order to determine if it met the requirements in the listings of impairments, amounted to a neglect of his duty to develop the evidence. Id.

Nevertheless, it is Claimant's responsibility to prove to the Commissioner that he or she is disabled. 20 C.F.R. § 416.912(a) (2010). Thus, Claimant is responsible for providing medical evidence to the Commissioner showing that he or she has an impairment. Id. § 416.912(c). In Bowen v. Yuckert, the Supreme Court noted:

> The severity regulation does not change the settled allocation of burdens of proof in disability proceedings. It is true . . . that the Secretary bears the burden of proof at step five . . . [b]ut the Secretary is required to bear this burden only if the sequential evaluation process proceeds to the fifth step. The claimant first must bear the burden . . . of showing that . . . he has a medically severe impairment or combination of impairments . . . . If the process ends at step two, the burden of proof never shifts to the Secretary. . . . It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so.

Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

Although the ALJ has a duty to fully and fairly develop the

42

record, he is not required to act as plaintiff's counsel. <u>Clark v.</u>
<u>Shalala</u>, 28 F.3d 828, 830-31 (8th Cir. 1994). Claimant bears the
burden of establishing a prima facie entitlement to benefits. <u>See</u>
<u>Hall v. Harris</u>, 658 F.2d 260, 264-65 (4th Cir. 1981); 42 U.S.C.A.
§ 423(d)(5)(A)("An individual shall not be considered to be under
a disability unless he furnishes such medical and other evidence of
the existence thereof as the Commissioner of Social Security may
require.") Similarly, Claimant "bears the risk of non-persuasion."
<u>Seacrist v. Weinberger</u>, 538 F.2d 1054, 1056 (4th Cir. 1976).

The undersigned proposes that the presiding District Judge
find that the ALJ properly evaluated the claim and was not
delinquent in any duty to refer a claimant for a consultative
examination per 20 C.F.R. § 416.917 (2010). It is noted that the
regulation provides that an ALJ "may" ask for a physical or mental
examination if there is not sufficient medical evidence about the
impairment to determine whether a disability exists. Here, the ALJ
did not err in finding there was sufficient medical evidence to
determine that Claimant was not under a disability regarding his
June 14, 2008 right leg injury as defined in the Social Security
Act. It is clear from the decision that the ALJ considered the
entire record, including Claimant's testimony regarding his medical
treatment, medications, and activities of daily living. (Tr. at 16-
26.)

As previously noted, it is Claimant's responsibility to prove

43

to the Commissioner that he or she is disabled. 20 C.F.R. § 416.912(a) (2006). Thus, Claimant is responsible for providing medical evidence to the Commissioner showing that he or she has an impairment. Id. § 416.912(c)(2010). Claimant bears the burden of establishing a prima facie entitlement to benefits. It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so. Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

For the reasons set forth above, it is hereby respectfully **RECOMMENDED** that the presiding District Judge **AFFIRM** the final decision of the Commissioner and **DISMISS** this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of <u>de novo</u> review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. <u>Snyder v. Ridenour</u>, 889 F. 2d 1363, 1366 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985); <u>Wright v. Collins</u>, 766 F.2d 841, 846 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, Judge Johnston, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendations and to transmit a copy of the same to counsel of record.

<u>June 23, 2011</u>
        Date

_Mary E. Stanley_
Mary E. Stanley
United States Magistrate Judge

45